IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

THOMAS M. GILBERT ARCHITECTS, P.C.,

Plaintiff,

v.                                                    Civil Action Number 3:07CV699

ACCENT BUILDERS AND DEVELOPERS,
LLC, et al.,

Defendants.

## MEMORANDUM OPINION

THIS MATTER comes before the Court on Plaintiff's Motion for Summary Judgment of Infringement and Motion to Exclude Expert Testimony. For the reasons expressed below and per the Court's Order of June 4, 2008, the Court GRANTED in part and DENIED in part Plaintiff's Motion for Summary Judgment (Dkt. No. 14) and Plaintiff's Motion to Exclude Expert Testimony (Dkt. No. 16).

## I. BACKGROUND

This is an action for copyright infringement. Plaintiff Thomas M. Gilbert Architect,[1] P.C. ("Gilbert") is an architecture firm located in Richmond, Virginia. Defendants Accent Builders and Developers, LLC; Design Custom Builders, Inc.; and Michael Tummillo (collectively, "Defendants") are involved in the development, construction, and sale of a townhome development project - the Mayland Townes Project - in Henrico County, Virginia.

---

[1]The Court notes that the although this case was filed under Thomas M. Gilbert Architects, P.C., plaintiff's contractual documents and letterhead state Thomas M. Gilbert Architect, P.C.

1

Tummillo states that he entered an oral agreement in 2002 with the owners of Aspect Properties, LLC, Kevin Spector and Richard Vass, to construct the townhouses for the Mayland Townes Project.  On July 26, 2002, Aspect retained Gilbert to provide schematic drawings and architectural plans ("Gilbert Plans") to be used to construct forty-two townhouses in connection with the Mayland Townes Project.  The agreement between Aspect and Gilbert contemplated two phases for the project.  During phase one, Gilbert was to provide schematic drawings for three models for a fee of $7,500. The contract required the remaining contract documents, including three floor plans, front and rear elevations, H.V.A.C. plans, and three foundation plans, to be provided in the second phase at a cost of $17,700.  Finally, the agreement stated that:  "The fee for reuse of the documents will be two hundred fifty dollars (250.00) per unit and any changes requested will be on an hourly basis." (Pl.'s Mem. Supp. Mot. Summ. J., Ex. A at 2.)  The agreement further provided that the "documents remain the property of Thomas M. Gilbert, Architect, P.C."  (Pl.'s Mem. Supp. Mot. Summ. J., Ex. A at 3.)  Gilbert delivered the plans to Aspect with the following copyright notice:

> THOMAS M. GILBERT, ARCHITECT, P.C. EXPRESSLY RESERVES ITS COMMON LAW COPYRIGHT OR OTHER PROPERTY RIGHTS IN THESE PLANS.  THESE PLANS ARE NOT TO BE REPRODUCED, CHANGED, OR COPIED IN ANY FORM OR MANNER WHATSOEVER, NOR ARE THEY TO BE ASSIGNED TO ANY THIRD PARTY, WITHOUT FIRST OBTAINING THE EXPRESS WRITTEN PERMISSION AND CONSENT OF THOMAS M. GILBERT, ARCHITECT, P.C.

(Pl.'s Mem. Supp. Mot. Summ. J., Ex. C .)  Aspect paid Gilbert the full amount under the agreement.

On May 29, 2003, Vass and Spector formed Accent Builders and Developers, LLC. Tummillo acquired an ownership interest in Accent in 2003 and eventually obtained complete ownership in 2004.  Tummillo asserts that when he purchased Accent, Vass and Spector required him to reimburse them for the money paid to Gilbert under the 2002 agreement for the Gilbert Plans.

After taking ownership of the project, Tummillo decided that the usable square footage in the family room of the townhouse units needed to be increased by moving the rear wall back three feet, and by moving the fireplace from the corner to the rear wall.  When Tummillo asked Gilbert to make the changes, Gilbert sent a proposal on September 11, 2006 offering to make the requested modifications for $14,000 ("2006 Proposal").  Because Tummillo considered the $14,000 fee unreasonable, Tummillo subsequently made two modifications, by hand, to the Gilbert Plans.  Tummillo also removed all references to the architects on the Gilbert Plans, including the copyright notice.

Once the county approved the plans with the two modifications, the Defendants began construction on the Mayland Townes Project.  During the course of construction, Defendants made copies of the modified plans for use in the completion of the Mayland Townes Project, including copies provided to certain suppliers and subcontractors.  Upon learning that Tummillo modified the Gilbert Plans in June 2007, Gilbert registered the plans with the United States Copyright Office on August 16, 2007[2] and sent a cease and desist letter to the Defendants on September 14, 2007.

Because the Defendants continued with the Mayland Townes Project, Gilbert filed suit on November 9, 2007, alleging that the Defendants infringed on its copyright by copying and modifying its plans, distributing copies of the modified plans to subcontractors, and using the modified plans to construct townhouses in connection with the Mayland Townes Project.  Presently, Gilbert seeks summary judgment on the issue of copyright infringement and to exclude the testimony of the Defendants' expert witness.  Each motion is discussed in turn.

---

[2]The Certificate of Registration shows that the Gilbert Plans were authored by another architectural firm, Charpentier & Chen, P.C.

3

## II.  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### A.    STANDARD OF REVIEW

A motion for summary judgment may be granted only where "there is no genuine issue as to any material fact" and where "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-25 (1986).  Where a party will have the burden of proof on an essential element of a claim or defense at trial and does not, after adequate time for discovery, make a showing sufficient to establish the existence of that essential element, there can be no genuine issue as to any material fact.  See Celotex, 477 U.S. at 322-23.  Courts must view the facts and the inferences drawn therefrom in the light most favorable to the non-moving party.  Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1004 (4th Cir. 1987).  While viewing the facts in such a manner, courts examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, to determine whether a triable issue of fact exists.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  But, the Court "may not make credibility determinations or weigh the evidence."  Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos, 264 F.3d 424, 435 (4th Cir. 2001).  "That is, [courts] should give credence to the evidence favoring the non-movant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses."  Id.  at 436 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-50 (2000)).  Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for preventing "claims and defenses [that] have no factual basis" from proceeding to trial.  Celotex, 477 U.S. at 327; accord Bouchat v. Baltimore Ravens Football Club, 346 F.3d 514, 526 (4th Cir. 2003).

4

## B.     DISCUSSION

To establish a prima facie case of copyright infringement, a plaintiff must demonstrate that (1) "he owned the copyright to the work that was allegedly copied," and (2) "the defendant copied protected elements of the work." Bouchat, 241 F.3d at 353.  The first element requires an analysis of whether the plaintiff has a registration certificate, and whether the copyrighted work is sufficiently original to warrant copyright protection. Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).  The plaintiff may prove the second element through direct or circumstantial evidence "in the form of proof that the alleged infringer had access to the work and that the supposed copy is substantially similar to the author's original work."  Bouchat, 241 F.3d at 353-54.

Here, Gilbert has submitted a Certificate of Registration showing an effective date of registration of August 16, 2007.  Defendants do not contest the validity of the registration certificate and, therefore, the first element is met.  Additionally, the Defendants do not dispute that they copied and modified the Gilbert Plans.  Instead, Defendants rely on three affirmative defenses: (1) implied nonexclusive license, (2) fair use pursuant to 17 U.S.C. § 107 of the Copyright Act, and (3) misuse of copyright.  The Defendants also assert a general defense to the elements of Gilbert's copyright infringement claim under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §§ 1201, et seq.

### 1.     Implied Nonexclusive License

"[A]n implied nonexclusive license for use of an otherwise copyright protected work is created when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor

intends that the licensee copy and distribute his work." <u>Nelson-Salabes, Inc. v. Morningside Dev., LLC</u>, 284 F.3d 505, 514 (4th Cir. 2002) (internal quotation marks omitted). "Such an implied license, a species of contract implied in fact, does not transfer ownership of the copyright;[3] rather, it simply permits the use of the copyrighted work in a particular manner." <u>Lowry's Reports, Inc. v. Legg Mason, Inc.</u>, 271 F. Supp. 2d 737, 749-50 (citing <u>Nelson-Salabes</u>, 284 F.3d at 514). An implied nonexclusive license can be given either orally or implied from conduct. <u>Nelson-Salabes</u>, 284 F.3d at 514. If the Court determines that such an implied nonexclusive license exists, then it constitutes an affirmative defense to copyright infringement. <u>Id.</u>

In this instance, it is clear that Aspect - not the Defendants - requested Gilbert, the creator, to develop architectural plans for the Mayland Townes Project, and that Gilbert developed and delivered the plans to Aspect; thereby, satisfying the first two prongs of the test. The issue here is whether Gilbert intended that the Defendants utilize the Gilbert Plans in constructing the Mayland Townes Project, independent of any future involvement by Gilbert in light of the Defendants' business relationship with Aspect.

The copyright owner's intent is the touchstone for determining whether an implied license exists. <u>John G. Danielson, Inc. v. Winchester-Conant Props.</u>, 322 F.3d 26, 40 (1st Cir. 2003). Although courts apply a broad totality-of-the-circumstances standard when evaluating the copyright owner's intent, the Fourth Circuit has recognized that the question of intent generally turns on at least three factors:

(1) whether the parties were engaged in a short-term discrete transaction as opposed

---

[3] To transfer copyright ownership, "an instrument of conveyance, or a note or memorandum of the transfer, . . .in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent" is required. 17 U.S.C. § 204.

to an ongoing relationship; (2) whether the creator utilized written contracts, such as the standard AIA contract, providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.[4]

Nelson-Salabes, 284 F.3d at 515-16.[5]

Even assuming that the contract between Aspect and Gilbert was short-term, it is undisputed that the 2002 agreement between Gilbert and Aspect expressly provided that the "documents remain the property of Thomas M. Gilbert, Architect, P.C." (Pl.'s Mem. Supp. Mot. Summ. J., Ex. A at 3.) Moreover, the Gilbert Plans themselves state that no rights are "to be assigned to any third parties without first obtaining the express written permission and consent of Thomas M. Gilbert, Architect, P.C." (Pl.'s Mem. Supp. Mot. Summ. J., Ex. C .) Thus, when Gilbert delivered the plans to Aspect, all documents stated Gilbert's intent to retain ownership and that licensing would require Gilbert's express permission.

---

[4]The Court notes that in evaluating the third factor courts "look to whether the supposed infringer obtained the plans directly from the supposed licensor, which would suggest permission to use them." John G. Danielson, 322 F.3d at 42. Here, Gilbert delivered the plans to Aspect only - not the Defendants.

[5]Applying these factors in Nelson-Salabes, the Fourth Circuit found that the plaintiff did not grant the defendants a nonexclusive license to use the plaintiff's architectural drawings. 284 F.3d at 516. The court concluded that the plaintiff did not intend to permit the defendants to use the drawings in the future without its involvement even though the plaintiff was not hired to develop plans for the entire project, created drawings pursuant to task-specific contracts performed in component parts, and none of the contracts containing language regarding future use were executed. Id. In reaching its conclusion, the Fourth Circuit reasoned that the parties intended for the plaintiff to serve in a long-term capacity, engaged in ongoing discussions concerning the plaintiff's development of the project, and that the plaintiff submitted contracts, albeit never executed, providing for future control, and specifically informed the defendants of the same. Id. Thus, evaluating the facts in their totality, the Fourth Circuit affirmed the district court's finding that the architect did not grant the defendants an implied nonexclusive license. Id. at 516-17.

When Gilbert learned that the Defendants were utilizing his plans without his permission, he sent a cease and desist letter advising them of the copyright violation. (Defs.' Mem. Opp'n Mot. Summ. J., Ex. H.)  Defendants attempt to overcome these fatal facts by pointing out that when Gilbert met with Tummillo in 2006 to discuss modifying the plans, Gilbert knew that Tummillo had taken over the project and never demanded that Tummillo needed to pay a licensing fee to use the Gilbert Plans.  But, the Defendants' argument fails to recognize that the parties were in the midst of negotiations.  When Gilbert was not retained and learned that the Defendants had continued the Mayland Townes Project, utilizing the Gilbert Plans, Gilbert sent a cease and desist letter.  Thus, Gilbert's single instance of inaction prior to a breakdown in negotiations does not outweigh Gilbert's expressed intent to retain ownership of the plans as expressly stated in the 2002 agreement and on the Gilbert Plans.  See Johnson v. Jones, 149 F.3d 494, 500 (6th Cir. 1998) (concluding that the architect's "isolated instance of inaction, coming as it did just before the breakdown of negotiations, is not enough to outweigh [the architect's] repeated expressions of intent that he retain ownership of his drawings" where the architect's contracts contained express provisions that he would retain ownership of his drawings, and that those drawings would not be used for completion of the project except by written agreement and with appropriate compensation).

Accordingly, the Court concludes that the Defendants have not presented sufficient evidence to create a jury issue on the affirmative defense of implied license as almost every objective fact points away from an intent to create an implied nonexclusive license, particularly the terms of the 2002 agreement and the copyright notice on the plans. See id.; Nelson-Salabes, 284 F.3d at 515-16; see also Lowry's Reports, 271 F. Supp. 2d at 750-51 (holding that the defendant's defense of implied license failed as a matter of law where the plaintiff's reports contained a copyright notice

and defendant continued to copy and distribute plaintiff's work over plaintiff's objections and, therefore, no rational jury could conclude that the parties mutually assented to a licensing arrangement) (applying federal and Maryland law); <u>N.A.D.A. Servs. Corp. v. Bus. Data of Va., Inc.</u>, 651 F. Supp. 44, 49 (E.D. Va. 1986) (holding that the creation of an implied license, as in the creation of any implied contract, requires a meeting of the minds).

### 2.      The Fair Use Doctrine

Defendants next contend that they were entitled to use and modify the Gilbert Plans pursuant to the fair use doctrine.  Fair use is an explicit limitation on the copyright owner's exclusive rights under the Copyright Act: "the fair use of a copyrighted work . . . is not an infringement of copyright." 17 U.S.C. § 107.  It permits the unauthorized use or reproduction of copyrighted work "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."  § 107.  "The rationale for the fair use doctrine is that, when the free flow of information is sufficiently vital, it should override the copyright holder's interest in the exclusive control of the work." <u>Advanced Computer Serv. of Mich., Inc. v. MAI Sys. Corp.</u>, 845 F. Supp. 356, 364 (E.D. Va. 1994).  Although fair use requires a case-by-case analysis to determine whether a particular use is fair, <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 577 (1994), the statute sets forth four factors to guide courts:

(1)      The purpose and character of the use, including whether such use is of a commercial nature or for nonprofit educational purposes;

(2)      The nature of the copyrighted work;

(3)      The amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)      The effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  These statutory factors should not be examined in isolation; instead, "[a]ll are to be explored, and the results weighed together, in light of the purposes of copyright.  <u>Campbell</u>, 510 U.S. at 578.

      a.     <u>Purpose and Character of the Use</u>

The purpose of the first factor in a fair use inquiry is to investigate "whether the new work merely supersedes the objects of the original creation, . . . or instead adds something new, with a further purpose or different character, . . . in other words, whether and to what extent the new work is transformative." <u>Id.</u> at 579.  Because the goal of copyright, promotion of the science and the arts, is generally furthered by the creation of transformative works, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." <u>Id.</u>  But, where the primary use of the copyrighted work is for a commercial purpose, the use is "presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright," <u>Sony Corp. of Am. v. Univ. City Studios, Inc.</u>, 464 U.S. 417, 451 (1984), and the central question is "whether the user stands to profit from the exploitation of the copyrighted material without paying the customary price." <u>Harper & Row, Publrs., Inc., v. Nation Enters.</u>, 471 U.S. 539, 562 (1985).

Here, Gilbert maintains that because the Defendants modified, copied, and used the Gilbert Plans precisely for their original use - to build Mayland Townes Project, the changes made by Tummillo did not transform the nature, character, or use of the work.  The Defendants argue that the issue is not one of transformation, but whether the Defendants paid the customary price.  Because Aspect paid Gilbert the full contract price for the unmodified Gilbert Plans, and the Defendants fully reimbursed Aspect for that cost, the Defendants contend that Gilbert was paid the customary price

10

and, thus, the first factor weighs in favor of fair use.

The Court disagrees and finds that the first factor weighs in Gilbert's favor. The Defendants used the Gilbert Plans for the commercial purpose of building and selling townhomes and, therefore, the Defendants' use is presumptively unfair. Further, as discussed previously, the Defendants payment to Aspect does not authorize the Defendants to copy and modify Gilbert's copyrights. Instead, Gilbert, as the owner of the copyright, would have had to authorize or license the Defendants to modify and copy the Gilbert Plans as explicitly stated on Gilbert's copyright notice.

     b.     Nature of the copyrighted work

The second statutory consideration calls for the recognition that "some works are closer to the core of intended protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." Campbell, 510 U.S. at 586. The more creative a work, the more protection it should be accorded because it is closer to the core of works protected by the Copyright Act. See 17 U.S.C. 102(a)(8); Sundeman v. The Seajay Soc'y, Inc., 142 F.3d 194, 204 (4th Cir. 1998). Architectural works are generally considered creative works. See id. Accordingly, as the Gilbert Plans are architectural drawings, this factor also weighs against a finding of fair use.

     c.     Amount and Substantiality of the Copied Portion

This factor favors copyright owners "where a significant percentage of the copyrighted work was copied, or where the percentage was not great, but the copied portion essentially was the 'heart' of the copyrighted work." Sundeman, 142 F.3d at 205. Here, although the Defendants concede that they have made use of substantially all of the Gilbert Plans, they note that, in the context of

architectural plans, this factor is in no way dispositive of the fair use analysis.  Because the

Defendants concede that this factor weighs in Gilbert's favor, no further discussion is necessary.

      d.    <u>Market Effect</u>

      The final statutory factor "considers the effect the allegedly infringing use has upon the

market for, or value of, the copyrighted work." <u>Id.</u> at 206.  This factor is "undoubtedly the single

most important element of fair use," <u>Harper & Row</u>, 471 U.S. at 566, because it touches on the

copyright owner's ability to "capture the fruits of his labor and hence his incentive to create." <u>Bond</u>

<u>v. Blum</u>, 317 F.3d 385, 396 (4th Cir. 2003).  Further,

> [i]t requires courts to consider not only the extent of market harm caused by the
> particular actions of the alleged infringer, but also whether unrestricted and
> widespread conduct of the sort engaged in by the defendant would result in a
> substantially adverse impact on the potential market for the original.

 <u>Campbell</u>, 510 U.S. at 590 (internal quotation marks omitted).

      Gilbert argues that the Defendants' infringement deprived Gilbert of revenue for his

proposed plan revisions and review of the impact of code changes on the project.  Gilbert points out

that the Defendants' use, when considered in the aggregate, would adversely impact the market for

the plans.  Relying on <u>McGowan v. Cross</u>, 901 F.2d 790, 1993 WL 125416 (4th Cir. 1993)

(unpublished table decision),[6] Defendants rejoin that an adverse effect occurs where the parties

---

[6]Plaintiff, Timothy McGowan purchased a copyrighted house plan, made twenty
modifications to the plan, and began construction of a house on the land.  <u>McGowan</u>,1993 WL
125416, at *1.  The property was conveyed to the Allens, who retained an architect to complete
construction of the house.  <u>Id.</u>  The plaintiff sued the architect claiming he obtained a valid
copyright for original works based on his modifications to the original house plan and that the
architect retained by the Allens infringed his copyright. <u>Id.</u>  The Fourth Circuit agreed with the
district court that the fair use doctrine entitled the defendants to use the plan without violating
the copyright laws.  <u>Id.</u>  Applying the four statutory factors, the Fourth Circuit found that (1) the

compete or where a defendant's use is of a manner and type which the plaintiff has previously licensed. Defendants assert that they have not competed with Gilbert, and because Gilbert was paid in full for the unmodified Gilbert Plans, a reasonable jury could conclude that Gilbert received all of the payments that he expected to receive for use of the Gilbert Plans.

Defendants' reliance on <u>McGowan</u> is misplaced. <u>McGowan</u> involved the construction of one house for personal use and, therefore, the Fourth Circuit found that the defendants "did not intend the modified plan to be used for commercial purposes." 1993 WL 125416, at *2. In contrast, the Defendants in this case modified and copied Gilbert's plans for the construction of forty-two townhomes, which is clearly a commercial purpose. Further, the Defendants' argument that Gilbert received all the payments he expected to receive is undermined by the 2002 agreement and the Gilbert Plans indicating that Gilbert retains ownership and any assignment to third parties require Gilbert's express written permission. The Defendants freely admit that they (1) contacted and met with Gilbert to discuss modification of the plans; (2) modified and copied the plans because Gilbert's services were too expensive; and (3) removed Gilbert's copyright notice from the plans prior to submitting them to the county for approval. These admissions - coupled with the copyright language on the 2002 agreement and the plans - indicate that not only did Gilbert expect payment for the modification and use of the Gilbert Plans, but that the Defendants, themselves, thought that some form of payment was necessary.

---

defendants reproduced the plan solely so that the house could be completed - not for commercial use; (2) the plaintiff made twenty insignificant changes to the original plan and, therefore, the modified plan lacked originality or inventiveness; (3) defendants used the modified plan in its entirety, and thus only this factor weighed in plaintiff's favor; and (4) the copying of the plan was for the sole purpose of completing the house - not to compete with the plaintiff - and, as such, the defendants' use of the plans did not materially impair the marketability of the work. <u>Id.</u> at 2.

Thus, as all four factors weigh in Gilbert's favor, the Court concludes that the Defendants' modification and use of the Gilbert Plans is not protected by the fair use doctrine.

### 3.      Copyright Misuse

The misuse of copyright defense applies when the copyright is used "in a manner violative of the public policy embodied in the grant of a copyright." Lasercomb Am., Inc. v. Reynolds, 911 F.2d 970, 978 (4th Cir. 1990). The court in Lasercomb observed that the misuse of copyright defense is closely related to the misuse of patent defense, which generally lies where a plaintiff has used the patent in question unduly to restrain competition (e.g., "price fixing, tie-ins, territorial restrictions, and so forth," id. at 976). As such, the Fourth Circuit found that the copyright owner misused its copyright by including a provision in its licensing agreements that prohibiting the licensee company from developing competing goods for the term of the agreement - ninety-nine years. Id. at 978-79. The court concluded that the need for the copyright owner "to protect its investment does not outweigh the public's right under our system to expect competition and the benefits which flow therefrom." Id. at 979; see also PRC Realty Sys., Inc. v. Nat'l Ass'n of Realtors, 1992 WL 183682, at *12 (4th Cir. 1992) (unpublished table decision) (finding that the plaintiff improperly used its copyright to impede all future development of an independent idea by the defendant or any other licensee).

Defendants maintain that the defense applies in this case because, by requiring Defendants to pay $14,000 for minor changes to the Gilbert Plans, which had an original cost of $17,700, a reasonable jury could find that Gilbert was attempting to unfairly and impermissibly leverage its copyright in a manner that is contrary to public policy under copyright law. Gilbert rejoins that it has not stifled competition and Defendants' argument suggests that if buying rights from a copyright

owner seems too expensive, then infringers have free rein to infringe.  Further, Gilbert points out that its $14,000 quote in the 2006 Proposal included a code review, not just the two modifications requested.

Even assuming, as the Defendants argue, that the $14,000 price was unreasonable, the question presented here is whether an overpriced copyright supports a defense of copyright misuse. The purpose of the misuse of copyright defense is to prevent abuse of the public policy embodied in the grant of a copyright. Lasercomb, 911 F.2d at 978.  The underlying public policy of a copyright is set out in the Constitution's Copyright and Patent Clause: "to promote the Progress of Science and useful Arts." Const. art. I, § 8, cl. 8; see also Sony, 464 U.S. at 431-32 (explaining that "[t]he limited scope of the copyright holder's statutory monopoly . . . reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts," and therefore, the "ultimate aim" of copyright law is "to stimulate artistic creativity for the general public good").

Accordingly, misuse of copyright law is generally found in cases where the copyright owner has engaged in some form of anti-competitive behavior.  See, e.g., Lasercomb, 911 F.2d at 979; Alcatel USA, Inc. v. DGI Techs., Inc., 166 F.3d 772, 793 (5th Cir. 1999) (finding that a reasonable jury could conclude, based on the licensing agreement, that the copyright owner had used its copyrights "to indirectly gain commercial control over products [the owner] does not have copyrighted"); Practice Mgmt. Info. Corp. v. Am. Med. Ass'n, 121 F.3d 516, 520 (9th Cir. 1997) (concluding that the copyright owner misused its copyright when it prohibited the licensee from using a competing coding system) opinion amended on other grounds, 133 F.3d 1140 (9th Cir.

15

1998).  Copyright misuse has also arisen where the plaintiff attempted to attempted to restrain the defendant from using material over which the plaintiff itself had no rights.  See qad. inc. v. ALN Assocs., Inc., 770 F. Supp. 1261, 1267 (N.D. Ill. 1991).

No court, however, has found, as the Defendants here urge, copyright misuse based on a copyright being overpriced or too expensive.  While it is true that a misuse of copyright defense is viable outside of anti-trust violations, the notion that a defendant may infringe a copyright because it finds the owner's price too expensive is terribly misguided, if not absurd.  Thus, the Court finds that the Defendants' copyright misuse defense lacks merit.

### 4.     Digital Millennium Copyright Act

Count IV of the Complaint alleges that the Defendants violated the DMCA by intentionally removing and altering copyright management information from the Gilbert Plans, knowing that they did not have the authority under applicable law or permission of the copyright owner.  The DMCA provides, in relevant part, that "[n]o person shall, without the authority of the copyright owner or the law - (1) intentionally remove or alter any copyright management information, . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title."   17 U.S.C.  §  1202(b)  (emphasis added).   "Copyright management information" is defined as "any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form. . . ." 17 U.S.C. § 1202(c).  The statute then lists eight categories of information, including title, author, and copyright notice.

Here, Defendants argue that while Gilbert has demonstrated that Tummillo removed the copyright notice from the Gilbert Plans, there is no evidence to show that Tummillo intentionally

16

did so, or that he had reason to know that it would induce, enable, facilitate, or conceal infringement of any right under the Copyright Act.  Defendants proffer that Tummillo testified that he was unfamiliar with copyright and he did not recall seeing the copyright notice when he modified the Gilbert Plans.  (Pl.'s Mem. Supp. Mot. Summ. J., Ex. B at 53:11-18.)  Given that section 1202(b) requires a showing of intent and Gilbert has not provided any evidence on that question, the Court concludes that summary judgment in Gilbert's favor on its DMCA claim would be inappropriate.

### C.  CONCLUSION

The Court concludes that the Defendants have infringed Gilbert's copyright and the affirmative defenses asserted by Defendants lack merit for the reasons expressed above.  The Court, however, finds that there are outstanding issues of material fact for the jury to decide on Gilbert's DMCA claim.

## III.  MOTION TO EXCLUDE EXPERT TESTIMONY

J. Baxter Bailey, current chief architect and principal in charge of the architecture firm Baxter Bailey & Associates and the Defendants' expert, is expected to testify that

(1)    The modifications requested by Defendants were "fairly routine in nature;"

(2)    The $14,000 requested in the 2006 Proposal was excessive for the work that would have revised/updated the original drawings;

(3)    A reasonable amount for modifying the Gilbert Plans would have been in the range of $4,800 to $5,200; and

(4)    The Gilbert Plans were not suitable to obtain building permits from Henrico County,

Virginia.[7]

(Defs.' Opp'n Mem. Mot. Exclude at 3; see also Ex. D.)  Gilbert seeks to have the Defendants'

expert witness, J. Baxter Bailey, excluded on grounds that his opinion is irrelevant, disregards whole

portions of the contracts on which he would opine, and offers legal conclusions.

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In other words, the trial court must determine whether the expert's proffered

opinion is reliable and the opinion is relevant to the facts at issue. See Daubert v. Merrell Dow

Pharms., Inc., 509 U.S. 579, 591-92 (1993); Bourne ex rel. Bourne v. E.I. DuPont de Nemours &

Co., 85 F. App'x 964, 966 (4th Cir. 2004).

Gilbert's arguments raise both relevancy and reliability concerns.  The Court first addresses

Bailey's conclusion that a reasonable amount for modifying the Gilbert Plans would have been in

the range of $4,800 to $5,200.  Gilbert argues that Bailey's Disclosure demonstrates that Bailey

limited his reasonable cost considerations to the two modifications and failed to consider the code

review aspects of the 2006 Proposal; therefore, Bailey's proffered testimony is of no value.

---

[7]Bailey summarized his testimony in his Disclosure as follows: "I believe, and will testify, that the [Gilbert] did not provide a complete set of construction documents in the first place, and the original plans w[]ere not suitable to obtain the building permit. [Gilbert] also overcharged for the work that would have revised/updated the original drawings."  (Defs.' Opp'n Mem. Mot. Exclude, Ex. D at 3.)

Defendants assert that Bailey states in his report that he reviewed the 2006 Proposal and concluded that $14,000 was an excessive amount to charge for "the work" that Gilbert listed in the Proposal, which included the code review.

A review of Bailey's Disclosure indicates that when Bailey analyzed the cost of the work, he only assessed the "requests to (a) lengthen the typical units some three feet . . . and to (b) relocate the fireplace/chimney from one wall to another and adjusting the window/door pattern." (Defs.' Opp'n Mem. Mot. Exclude, Ex. D. at 2, E.3.) The Disclosure does not show where Bailey accounted for the code review in arriving at his estimate of a reasonable cost of $4,800 to $5,200. Accordingly, the Court finds that the expert's conclusion that a reasonable amount for modifying the Gilbert Plans would have been in the range of $4,800 to $5,200 is unreliable because the estimate fails to include an allocation for all of the work described in the 2006 Proposal, including but not limited to the code review.

Additionally, given the Court's resolution of Plaintiff's Motion for Summary Judgement of Infringement, many of Bailey's conclusions appear irrelevant to the remaining issues of (1) Plaintiff's DMCA claim and (2) damages. But, because the parties have not had an opportunity to brief this issue, the Court will reserve its ruling on the relevance of Bailey's testimony to the remaining issues.

## IV. CONCLUSION

For the foregoing reasons and per the Court's Order of June 4, 2008, the Court GRANTED in part and DENIED in part Plaintiff's Motion for Summary Judgment of Infringement and Plaintiff's Motion to Exclude Expert Testimony.

19

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

It is SO ORDERED.

_____ /s/ _____
James R. Spencer
Chief United States District Judge

Entered this __28th__ day of August 2008

20